UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| M.L.S., a minor, by and through his Next Friend, Dylan Lingerfelt<br><br>*Petitioner*,<br>v.<br><br>WARDEN, Upstate Evaluation and Development Center; FIELD OFFICE DIRECTOR, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement; DAVID VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, in his official capacity as U.S. Secretary of Homeland Security; and TODD BLANCHE, in his official capacity as Attorney General of the United States,<br><br>*Respondents*. | Case No. |

**<u>PETITION FOR WRIT OF HABEAS CORPUS</u>**

Petitioner M.L.S. is a 17-year-old boy who fled to the United States from Honduras at the age of thirteen [redacted]. After he was designated as an unaccompanied immigrant child and taken into the custody of the Office of Refugee Resettlement ("ORR"), ORR released him to his aunt after finding that he presented no flight risk or danger to the community. When M.L.S.'s aunt subsequently [redacted], M.L.S. was placed into the legal custody of the South Carolina Department of Social Services ("SC DSS").

Earlier this year, U.S. Citizenship and Immigration Services approved M.L.S.'s application for Special Immigrant Juvenile Status ("SIJS"), a humanitarian immigration protection for young people that state courts have determined have suffered parental maltreatment and whose best

interests it is in to remain in the United States. SIJS provides these vulnerable young people permanency and stability by giving them a pathway to citizenship.

On Saturday, September 19, 2026, M.L.S. will be released from the South Carolina Department of Juvenile Justice ("SC DJJ") for good behavior after completing a sentence for a juvenile delinquency adjudication. Rather than being returned to SC DSS custody, however, U.S. Immigration and Customs Enforcement ("ICE") will detain M.L.S. pursuant to a detainer claiming that he is subject to mandatory detention under the Laken Riley Act ("LRA").

This detention is unlawful for at least two reasons. First, the LRA does not apply to juvenile delinquency adjudications and thus does not mandate M.L.S.'s detention. So given M.L.S.'s prior release by ORR and the strong liberty interest created by his SIJS, he should be provided meaningful pre-deprivation process before being re-detained to make sure his detention is justified. Instead, M.L.S. has been provided no process whatsoever, violating his procedural due process rights. Second, federal law requires that unaccompanied children must be placed in the "least restrictive setting" consistent with their best interests. 8 U.S.C. § 1232(c)(2)(A). Yet, upon information and belief, there has been no finding that M.L.S. being taken into physical custody and detained away from his legal custodian, SC DSS, satisfies this requirement.

In light of M.L.S.'s imminent unlawful re-detention, he respectfully requests that this Court: (1) enjoin Respondents from transferring him outside of this District for the duration of this proceeding; (2) enter an Order to Show Cause requiring Respondents to file a return within three days and setting a hearing within five days, per 28 U.S.C. § 2243; and (3) issue a writ of habeas corpus ordering Respondents to immediately release M.L.S. to the custody of SC DSS and enjoining his re-detention absent adequate pre-deprivation process. Petitioner also requests that this Court maintain jurisdiction regardless of where ICE transfers M.L.S.

## PARTIES

1. Petitioner M.L.S. is a 17-year-old Honduran national who entered the United States as an unaccompanied child and has been residing here since the age of 13. His legal custodian is SC DSS. His immigration attorney Dylan Lingerfelt serves as his next friend pursuant to Fed. R. Civ. P. 17(c)(1). M.L.S. is currently in the physical custody of Respondents in this District. Exhibit A (July 13, 2026, Detainer).

2. Dylan Lingerfelt is the Next Friend of Petitioner M.L.S. Mr. Lingerfelt is over the age of 18, a licensed attorney, and represented Petitioner with his SIJS application and in his removal proceedings. Petitioner M.L.S. appears by and through Dylan Lingerfelt.

3. Respondent Warden of the Upstate Evaluation and Development Center is M.L.S.'s immediate custodian currently. Respondent Warden is part of the South Carolina Department of Juvenile Justice. General counsel for S.C. Department of Juvenile Counsel confirmed it would turn over M.L.S. to ICE on Saturday, September 19, 2026.

4. Respondent Field Office Director, Enforcement and Removal Operations, ICE, is the Field Office Director responsible for ICE's operations in South Carolina. At the time of this filing, Respondent Field Office Director is also the immediate custodian of M.L.S. because M.L.S. is in their physical custody.

5. Respondent David Venturella is sued in his official capacity as Acting Director of ICE. As the Acting Director of ICE, Respondent Venturella is a legal custodian of M.L.S.

6. Respondent Markwayne Mullin is sued in his official capacity as Secretary of Homeland Security. As the head of the Department of Homeland Security ("DHS"), the agency tasked with enforcing immigration laws and the parent agency of ICE, Secretary Mullin is M.L.S.'s ultimate legal custodian.

7. Respondent Todd Blanche is sued in his official capacity as Attorney General of the United States. As Attorney General, Respondent Blanche oversees the immigration court system, including the immigration judges who conduct removal proceedings and bond hearings as his designees, and is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103(g). He is legally responsible for administering M.L.S.'s removal and bond proceedings, and as such, he is a legal custodian of M.L.S.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under the U.S. Constitution. U.S. Const. art. I § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require.").

9. The Court also has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1651 (the All Writs Act); and 28 U.S.C. § 2241 (habeas corpus).

10. This Court has additional remedial authority under 28 U.S.C. §§ 2201-02 (the Declaratory Judgment Act) and Fed. R. Civ. P. 65 to grant injunctive and declaratory relief.

11. Venue is proper in the District of South Carolina under 28 U.S.C. § 1391(e) because Respondents are vendors, employees, officers, and agencies of the United States, and because a substantial part of the events giving rise to these claims occurred in this District.

12. Venue is also proper under 28 U.S.C. § 2241(d) because M.L.S. is detained within this District.

## LEGAL FRAMEWORK

### A. A Distinct Statutory Scheme Governs the Custody and Care of Unaccompanied Immigrant Children

13. The care and custody of unaccompanied immigrant children is governed by a legal framework consisting primarily of two statutes (the Homeland Security Act of 2002 and the

Trafficking Victims Protection Reauthorization Act of 2008), accompanying federal regulations, and a settlement agreement that is binding on the pertinent federal agencies (the 1997 Flores Settlement Agreement).

14. In 2002, Congress passed the Homeland Security Act ("HSA"), transferring functions of the former INS to other government entities. Pub. L. No. 107-296, 116 Stat. 2153 (2002). Specifically, the HSA transferred authority over the care and custody of unaccompanied immigrant children from the INS to ORR, which is housed within the Department of Health and Human Services ("HHS"). 6 U.S.C. § 279.

15. The HSA defines an unaccompanied child as a child who:

(A) has no lawful immigration status in the United States;

(B) has not attained 18 years of age; and

(C) with respect to whom —

i. there is no parent or legal guardian in the United States; or

ii. no parent or legal guardian in the United States is available to provide care and physical custody. 6 U.S.C. § 279(g)(2).

16. Congress' decision to transfer responsibility for the care and custody of unaccompanied children from the INS to ORR reflected a determination that caring for children who arrive to the United States without their parent or legal guardian and immigration enforcement were incompatible roles for a single agency. Within HHS, ORR is responsible for children's safety and welfare and is explicitly "not a law enforcement agency." Foundational Rule, 89 Fed. Reg. at 34399, 34423, 34591.

17. Congress then expanded protections for unaccompanied children in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), reaffirming

its intent to treat unaccompanied children differently than immigrant adults, both in detention and in immigration proceedings. 8 U.S.C. § 1232 et seq.

18. The TVPRA requires the HHS, through ORR, to manage the care and custody of all unaccompanied children. 8 U.S.C. § 1232(c)(2). The statute requires ORR to place unaccompanied children "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A); *see also* 45 C.F.R. § 410.1003(f). The least restrictive setting is typically release from ORR custody. *See* 8 U.S.C. § 1232(c)(2)(A); 45 C.F.R. § 410.1209(e); *Saravia v. Sessions*, 905 F.3d 1137, 1143 (9th Cir. 2018).

19. Before releasing an unaccompanied child from its custody, the agency must "consider danger to self, danger to the community, and risk of flight." *Id.*; *see also* 6 U.S.C. § 279(b)(2)(A). ORR may release the unaccompanied child to a "sponsor" who already lives in the United States, so long as these and other criteria are satisfied. 6 U.S.C. § 279(b)(2)(A); *see also* 45 C.F.R. § 410.1201. ORR is required to release unaccompanied children without "unnecessary delay" to their legal guardian. 45 C.F.R. § 410.1201(a)(2).

20. The Flores Settlement Agreement establishes national minimum standards for the treatment and placement of minors in immigration custody. All children detained by ICE are class members protected by the Flores Settlement Agreement.

21. The Flores Settlement Agreement arose from a lawsuit filed by a group of immigrant children challenging their detention and seeking to be released to family members and/or sponsors within the United States. *See Flores v. Sessions*, 862 F.3d 863, 869 (9th Cir. 2017) (discussing the history of the Flores litigation).

22. In 1997, the plaintiff children entered into a consent decree with the federal government that created a nationwide policy governing the custody and release of immigrant

children by immigration authorities. Stipulated Settlement Agreement, *Flores v. Reno,* No. CV 84-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997) ("Flores Settlement Agreement"); *see also Flores v. Sessions*, Case No. CV 85-4544-DMG (C.D. Cal., July 9, 2018) (affirming the terms of the Flores Settlement Agreement).

23. The Flores Settlement Agreement remains under the supervision of U.S. District Judge Dolly M. Gee in the Central District of California. *Flores v. Bondi*, No. CV 85-4544-DMG (AGRx).[1]

24. "The *Flores* Settlement Agreement [FSA] remains in full force and effect as to the DHS, including the U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement." *Flores v. Garland*, 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024).

25. Among other things, the Flores Settlement Agreement requires that minors: (a) cannot be held with unrelated adults for more than 24 hours, (b) must be placed in the "least restrictive setting" appropriate to the minor's needs, (c) can only be held in "secure" facilities if strict criteria are met.

26. Section 462 of the HSA extended the key terms of the Flores Settlement Agreement to all unaccompanied immigrant children, including the requirement that ORR place such children in the least restrictive setting. *See* Pub. L. 107-296, 116 Stat. 2153 (Nov. 25, 2002).

**B. SIJS Provides a Pathway to Citizenship for Immigrant Children Who Have Suffered Parental Maltreatment**

27. Separate and apart from unaccompanied children, in 1990, Congress created SIJS to protect certain vulnerable immigrant children and provide them a pathway to citizenship. Immigration Act of 1990, Pub. L. No. 101-649, § 153, 104 Stat. 4978 (1990) (amending various

---

[1] Following the promulgation of the Foundational Rule, the Flores Settlement Agreement was partially terminated as to HHS. *Flores v. Garland*, 2024 WL 3467715 (C.D. Cal., June 28, 2024).

sections of the INA). SIJS "alleviates hardships experienced by some dependents of United States juvenile courts by providing qualified [noncitizens] with the opportunity to apply for special immigrant classification and lawful permanent resident status, with [the] possibility of becoming citizens of the United States in the future." Special Immigrant Status, 58 Fed. Reg. 42843, 43844 (Aug. 12, 1993). Since 1990, Congress has amended the INA multiple times to expand the protections of SIJS, most recently in 2008, through the TVPRA, Pub. L. 110-457, § 235(d), 122 Stat. 5044 (2008).

28. To be granted SIJS, youths must first "satisf[y] a set of rigorous, congressionally defined eligibility criteria." *Osorio-Martinez v. U.S. Att'y Gen.*, 893 F.3d 153, 163 (3d Cir. 2018); *Fuentes v. United States Citizenship & Immigr. Servs.*, 184 F.4th 311, 314–15 (4th Cir. 2026) (explaining eligibility requirements for SIJS). Specifically, to be eligible for SIJS, a noncitizen youth must be present in the United States and obtain judicial determinations in a state juvenile court order that they are dependent on the juvenile court or placed by the court under the custody of a state agency or an individual; cannot be reunified with one or both parents because of abuse, neglect, abandonment, or other similar basis; and that it is not in their best interest to return to their country of origin. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c).

29. The application process for SIJS includes submitting a petition to U.S. Citizenship and Immigration Services ("USCIS"), along with the state juvenile court order and other evidence. *See* 8 C.F.R. § 204.11(b). If USCIS exercises its statutory "consent function" to approve the petition, the agency recognizes the state juvenile court's determinations, including that the child's return to their country of origin would be contrary to their best interests. 8 U.S.C. § 1101(a)(27)(J)(iii).

30. The main benefit of SIJS—and indeed, its core purpose—is that it confers on vulnerable young people the right to seek lawful permanent resident ("LPR") status (or a "green card"), while remaining in the United States, through a process called adjustment of status. *See* 8 U.S.C. § 1255(h); *Garcia v. Holder*, 659 F.3d 1261, 1271 (9th Cir. 2011) (abrogated on other grounds) (SIJS "show[s] a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for LPR status").

31. Although SIJS renders youth eligible to apply for adjustment to LPR status, they can only do so when a visa is immediately available to them. 8 U.S.C. § 1255(h). However, there is an annual limit on visas available to SIJS beneficiaries. 8 U.S.C. § 1153(b)(4). And since 2016, the number of SIJS beneficiaries has surpassed the supply of available visas for most countries, leaving what has been estimated to be more than 100,000 young people in a SIJS backlog, waiting to apply for a green card.[2] According to the USCIS September Visa Bulletin, there are currently only sufficient visas available for people who filed for SIJS on or before December 15, 2022 to immediately apply for LPR status.[3]

**C. The Laken Riley Act Does Not Apply to Juvenile Delinquency**

32. The Laken Riley Act (LRA) recently expanded mandatory immigration detention to include individuals who are arrested for, charged with, convicted of, or admit to committing specified crimes. 8 U.S.C. § 1226(c)(1)(E).

33. Although the LRA does not explicitly exempt children from its mandatory detention provisions, courts have not considered acts of juvenile delinquency (including

---

[2] *See* R. Davidson et al., *False Hopes: Over 100,000 Immigrant Youth Trapped in the SIJS Backlog* (2023), https://perma.cc/J75S-4DRR.

[3] Department of State, Visa Bulletin for September, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2026/visa-bulletin-for-september-2026.html (SIJS is included under the employment-based visa category, 4th).

admissions to acts of delinquency) qualifying offenses under the LRA. *See, e.g.*, *C.R.J.M. v. Kennedy*, No. 2:26-cv-00742-DJC-EFB, 2026 WL 809940, at *3 (E.D. Cal. Mar. 24, 2026).

34. This is consistent with the fact that, under settled interpretation of the Immigration and Nationality Act (INA), an act of juvenile delinquency is not a crime. *Matter of Devison*, 22 I&N Dec. 1362, 1365 (BIA 2000) (reaffirming longstanding rule "that juvenile delinquency proceedings are not criminal proceedings, that acts of juvenile delinquency are not crimes, and that findings of juvenile delinquency are not convictions for immigration purposes"); *see also* 7 USCIS-PM F.7(C)(4) ("Findings of juvenile delinquency are not considered criminal convictions for purposes of immigration law."). Indeed, as Congress itself has recognized, adjudications for juvenile delinquency are separate from criminal convictions. *See Devinson*, 22 I&N Dec. at 1366 (noting that the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031-5032, "makes it clear that a juvenile delinquency proceeding results in the adjudication of a status rather than conviction for a crime").

35. The LRA's terms "charged with" and "arrested for" modify the terms "offense" and "crime." 8 U.S.C. § 1226(c)(1)(E). These two terms also appear in the INA's current grounds of inadmissibility and have long been interpreted to refer only to adult crimes. *See, e.g.*, 8 U.S.C. § 1182(a)(2)(A) (referring to convictions and admissions of certain crimes), 8 U.S.C. § 1182 (a)(2)(B) (referring to people convicted of two or more offenses). Similarly, the LRA's language regarding what constitutes an admission of a crime, 8 U.S.C. § 1226(c)(1)(E), is identical to the same language in the INA inadmissibility ground only applied to adult crimes, 8 U.S.C. § 1182(a)(2)(A)(i) (covering a person "who admits having committed, or who admits committing acts which constitute the essential elements of" certain crimes).

36. If Congress meant to upend decades of immigration law precedent with the LRA, it would have been explicit. Indeed, the only two times that the INA has imposed a mandatory bar based on juvenile delinquency, this was specifically stated in the statute or regulation. *See* the Adam Walsh Act provisions at 8 U.S.C. § 1152(a)(1)(A)(viii), which includes certain delinquency dispositions as defined at 34 U.S.C. § 20911(8) and the Family Unity inclusion of delinquency dispositions at 8 C.F.R. § 236.13(d).

37. In the absence of any explicit indication in the text of the LRA, 8 U.S.C. § 1226(c)(1)(E) should be interpreted to be only about crimes, not acts of delinquency addressed in a civil system. Thus, an arrest or charge for one of the enumerated offenses that is or would be handled in a juvenile delinquency system must not trigger the mandatory detention provision. *See C.R.J.M.*, 2026 WL 809940, at *3 (holding that delinquency proceedings do not trigger LRA and ordering minor's immediate release).

## <u>RELEVANT FACTS AND PROCEDURAL HISTORY</u>

### M.L.S. is detained and released from ORR custody

38. M.L.S. is an unaccompanied child who fled Honduras in late 2022 when he was 12 years old, after [redacted]. He turned 13 while making the harrowing journey by foot and bus, through Honduras, Guatemala, and Mexico, with his 15-year-old cousin.

39. In January 2023, after M.L.S. presented himself to an immigration official at the U.S.-Mexico border, DHS determined that he was an unaccompanied child under 6 U.S.C. § 279(g)(2). It then transferred M.L.S. to ORR custody, as mandated by the TVPRA.

40. M.L.S. remained in ORR custody for approximately three months. ORR subsequently determined that M.L.S. should be released to his aunt in South Carolina under a

sponsor care agreement, finding that he did not present a flight risk or a danger to the community. Exhibit B, ORR Verification of Release.

**M.L.S. is placed in foster care**

41. After M.L.S.'s aunt [redacted] on February 3, 2025, M.L.S. was committed to the custody of SC DSS and placed in emergency protective custody.

42. On July 24, 2025, the Family Court, Thirteenth Judicial Circuit in South Carolina ("SC Family Court") issued a Merits Order, granting legal custody and guardianship to SC DSS. Exhibit C, Merits Order (filed under seal).

43. On July 30, 2025, the SC Family Court issued an Order finding that [redacted] Exhibit D, Special Findings Order; Exhibit E, Honduras Secretary of Child, Youth, and Family Home Study (filed under seal).

44. On April 8, 2026, the SC Family Court found that [redacted] Exhibit F, Order for Permanency Planning (filed under seal).

45. On June 19, 2026, the SC Family Court amended its prior order to clarify that [redacted] Order (Ex. E) was in full force and effect. Exhibit G, Modified Order (filed under seal).

**M.L.S. obtains SIJS**

46. Upon information and belief, on September 25, 2025, DHS issued M.L.S. a Notice to Appear ("NTA"), the charging document that initiates removal proceedings, which charged him as removable for being present in the United States without permission. M.L.S.'s proceedings are venued in the Charlotte, North Carolina Immigration Court and his next hearing date is set for October 2027.

47. After obtaining *pro bono* legal representation, M.L.S. applied for SIJS on October 17, 2025, supported by his Special Findings Order from the SC Family Court. See Exhibit H, I-360 SIJS Receipt Notice.

48. USCIS approved M.L.S.'s SIJS petition on July 6, 2026. Exhibit I, I-360 SIJS Approval Notice. M.L.S. is currently waiting in the SIJS visa backlog to apply for his green card.

**DHS issues a detainer erroneously invoking the LRA and detains M.L.S. without any opportunity to be heard or determination of least restrictive setting**

49. On May 21, 2026, M.L.S. was committed to the Upstate Evaluation and Development Center, a detention facility of SC DJJ, [redacted].

50. On July 13, 2026, Respondents issued an immigration detainer alerting SC DJJ that it intended to take M.L.S. into custody pursuant to the LRA, 8 U.S.C. § 1226(c)(1)(E). Exhibit A.

51. Despite the fact that the LRA does not apply to M.L.S.'s juvenile delinquency adjudications, and despite M.L.S.'s prior release from ORR custody and his approved SIJS petition, Respondents will arrest M.L.S. on Saturday, September 19, 2026, upon his release from SC DJJ for good behavior. Exhibit J, Declaration of Attorney Diana Marin.

52. Upon information and belief, Respondents will provide M.L.S. with no process prior to detaining him to assess whether his re-detention is necessary or consistent with placement in the "least restrictive setting" and his best interests.

53. Respondents intend, upon information and belief, to transfer M.L.S. to custody outside South Carolina, even though SC DSS has legal custody over him and intended to take him back into their care upon his release from SC DJJ.

## CAUSES OF ACTION

### FIRST CLAIM

### Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution Procedural Due Process

54. M.L.S. repeats and re-alleges the allegations contained in all preceding paragraphs of this Petition as if fully set forth herein.

55. The government may not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. V. Due process protects "all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 698 (2001). A child's interest in being free from confinement is no narrower than that of an adult. *In re Gault*, 387 U.S. 1, 13 (1967); *Reno v. Flores*, 507 U.S. 292, 316 (1993) (O'Connor, J. and Souter J., concurring) ("[The Supreme Court] ha[s] consistently […] rejected the assertion that 'a child, unlike an adult, has a right 'not to liberty but to custody.'").

56. The procedural due process guarantee of the Fifth Amendment requires that individuals be provided adequate process before being deprived of liberty or property interests. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

57. To assess what process is due, courts must assess (1) "the private interest that will be affected by the official action[,]" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards[,]" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*.

58. M.L.S. has a substantial private interest in his liberty. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Moreover, previously releasing an individual from detention, as M.L.S. was by ORR, creates an independent liberty interest in "remaining out of custody" absent some significant change. *See F.S.S.M. v. Wofford*, No. 25-01518, 2025 WL 3526671, at *3 (E.D. Cal. Dec. 9, 2025) (citing *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)). Furthermore, to be approved for SIJS, M.L.S. had to meet stringent eligibility criteria and he was promised that, in return, he would be given a meaningful path to LPR status in this country. That came with the expectation that he could build a life here without risking arbitrary arrest, detention, and removal that would strip him of the very permanency Congress created SIJS to provide vulnerable youth like him—further strengthening his interest in his liberty. *See Rodriguez v. Perry*, 747 F. Supp. 3d 911 (E.D. Va. 2024); *Sarmiento v. Perry*, No. 25-CV-01644, 2025 WL 3091140, at *3 (E.D. Va. Nov. 5, 2025); *Campos-Flores v. Bondi*, No. 25-cv-797, 2025 WL 3461551, at *6 (E.D. Va. Dec. 2, 2025).

59. The second *Mathews* factor also weighs in M.L.S.'s favor. M.L.S. was previously released from detention after being found that he is neither a danger nor a flight risk, and his re-detention without any process whatsoever make the risk of erroneous deprivation of liberty high.

Respondents' invocation of the LRA to claim that M.L.S. is subject to mandatory detention under 8 U.S.C. § 1226(c)(1)(E) is misplaced. Respondents' interpretation of the LRA contravenes decades of clear case law holding that under the INA, an act of juvenile delinquency is not a crime. *See C.R.J.M.* 2026 WL 809940, at *3 (holding that delinquency proceedings in state court do not trigger mandatory detention under LRA and finding high risk of erroneous deprivation of liberty). Accordingly, no statute mandates M.L.S.'s detention and the value of additional procedural safeguards to determine whether detention is appropriate is high.

60. The third *Mathews* factor favors M.L.S., as well. M.L.S.'s detention imposes high fiscal and administrative burdens on Respondents. Releasing M.L.S. and requiring the government to provide a pre-deprivation hearing before re-detaining him, to ensure any detention is actually justified, stands to save the government money and effort wasted on erroneous detention. *See Velasco Lopez v. Decker*, 978 F.3d 842, 854 (2d Cir. 2020). And unlawful detention and violation of noncitizens' constitutional rights disserve the public interest.

61. Respondents thus violated procedural due process by re-detaining M.L.S. without adequate procedural protections before depriving him of his liberty. Where an unaccompanied child was previously apprehended and released, like M.L.S., due process requires a "pre-deprivation bond hearing where the government bears the burden of proving by clear and convincing evidence that petitioner is a flight risk or danger to the community." *Singh v. Andrews*, No. 1:25-cv-00801-KES-SKO (HC), 2025 WL 1918679, at *8 (E.D. Cal. July 11, 2025); *see also Garcia Domingo v. Castro*, 806 F. Supp. 3d 1246, 1252-53 (D.N.M. 2025) (similar); *Urquilla-Ramos v. Trump*, No. 2:26-CV-00066, 2026 WL 475069 (S.D.W. Va. Feb. 19, 2026) (finding due process violation where individual previously released as an unaccompanied child "was re-arrested

and detained [with] neither notice nor an opportunity to be heard as to whether a change in custody status was warranted”).

62. Accordingly, M.L.S. respectfully requests that this Court order Respondents to immediately release him and enjoin his re-detention without adequate pre-deprivation process.

**SECOND CLAIM**

**Violation of Section 235 of the TVPRA**
**8 U.S.C. § 1232(c)(2)(A)**

63. M.L.S. repeats and re-alleges the allegations contained in all preceding paragraphs of this Petition as if fully set forth herein.

64. M.L.S. is an unaccompanied minor as defined under the Homeland Security Act. 6 U.S.C. § 279(g)(2): he has no lawful immigration status, is under 18, and has no parent or legal guardian in the United States nor is one available to provide care and physical custody.

65. Respondents have a non-discretionary duty to promptly place M.L.S. in the least restrictive setting that is in his best interests. 8 U.S.C. § 1232(c)(2)(A).

66. Upon information and belief, Respondents have failed to assess whether holding M.L.S. in physical immigration custody is the least restrictive setting in his best interests, particularly given his legal custody by SC DSS, in violation of 8 U.S.C. § 1232(c)(2)(A).

**THIRD CLAIM**

**Violation of the Flores Settlement Agreement**

67. M.L.S. repeats and re-alleges the allegations contained in all preceding paragraphs of this Petition as if fully set forth herein.

68. All children detained by Immigration and Customs Enforcement (ICE) are class members protected by the Flores Settlement Agreement. *Flores v. Garland*, 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024).

69. M.L.S. is a minor and will be held by ICE at an undisclosed facility.

70. There are no juvenile ICE facilities in the state of South Carolina.

71. There are no ICE facilities in the state of South Carolina.

72. Individuals held by ICE in South Carolina are held in state-run correctional facilities while ICE arranges for their transfer out of state, typically to ICE detention facilities in Georgia.

73. Upon information and belief, Respondents will hold M.L.S. beyond the twenty-four-hour period allowed under the Flores Settlement Agreement.

74. Upon information and belief, if Respondents do not release M.L.S. to SC DSS, it will not be able to hold M.L.S. separately from adults while he remains in the state of South Carolina.

75. Upon information and belief, Respondents will continue to hold MLS in a secure facility despite there being less restrictive alternatives, such as release to South Carolina's Department of Social Services.

76. Upon information and belief, Respondents do not have probable cause to continue to detain MLS in a restrictive setting in violation of the Flores Settlement Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

a. Assume jurisdiction over this matter;

b. Enjoin Respondents from transferring Petitioner away from the jurisdiction of this District pending these proceedings;

c. Maintain jurisdiction over this matter even after Petitioner is transferred outside of the jurisdiction;

d. Issue and order to show cause requiring Respondents to file a return to this petition within three days and setting a hearing within give days;

e. Declare that Petitioner's detention violates the Due Process Clause of the Fifth Amendment and the TVPRA;

f. Issue a Writ of Habeas Corpus ordering Respondents to immediately release Petitioner from custody without restraints on his liberty beyond those that existed prior to his unlawful re-detention;

g. Order that Respondents cannot re-detain Petitioner without notice and a pre-deprivation hearing before a neutral arbiter where the government bears the burden of justifying his detention by clear and convincing evidence;

h. Order that Respondents cannot re-detain Petitioner without determining that any detention constitutes placement in the least restrictive setting in his best interests pursuant to the TVPRA;

i. Grant such further relief as this Court deems just and proper.

DATED: September 18, 2026,

Respectfully Submitted,

*s/Brad Banias*
BRAD BANIAS
Banias Law LLC
602 Rutledge Avenue
Charleston, SC 29413
843.352.4272
brad@baniaslaw.com
SC Bar No.: 76653
Fed ID No.: 11585bb

*s/Diana Marin*
National Immigration Project
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
734-307-0862

diana@nipnlg.org
Michigan Bar No.: P81514

Pro Hac Vice Admission Forthcoming

*Attorneys for Petitioner*

**28 U.S.C. § 2242 VERIFICATION STATEMENT**

I am submitting this verification on behalf of the Petitioner because I am one of the Petitioner's attorneys. I have discussed with the Petitioner the events described in this Petition. On the basis of those discussions, I hereby verify that the statements made in this Petition are true and correct to the best of my knowledge.

DATED: September 18, 2026,

Respectfully Submitted,

*s/Diana Marin*
National Immigration Project
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
734-307-0862
diana@nipnlg.org
Michigan Bar No.: P81514

Pro Hac Vice Admission Forthcoming

*Attorney for Petitioner*