UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

M.L.S., a minor, by and through his Next Friend, Dylan Lingerfelt

*Petitioner*,

v.

WARDEN, Upstate Evaluation and Development Center; FIELD OFFICE DIRECTOR, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement; DAVID VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, in his official capacity as U.S. Secretary of Homeland Security; and TODD BLANCHE, in his official capacity as Attorney General of the United States,

*Respondents*.

Case No.

**APPLICATION FOR A TEMPORARY RESTRAINING ORDER OR IN THE ALTERNATIVE PRELIMINARY INJUNCTION**

M.L.S. is a 17-year-old boy who fled Honduras to the United States at the age of thirteen. Upon entering the country, he was designated an unaccompanied immigrant child and taken into the custody of the Office of Refugee Resettlement ("ORR"), which later released him to his aunt after finding that he presented no flight risk or danger to the community. When M.L.S.'s aunt subsequently abandoned him, M.L.S. was placed into the legal custody of the South Carolina Department of Social Services ("SC DSS").

Earlier this year, M.L.S. was granted Special Immigrant Juvenile Status ("SIJS"), a humanitarian immigration protection for young people that state courts have determined have suffered parental maltreatment and whose best interests it is to remain in the United States. SIJS

provides these vulnerable young people permanency and stability by giving them a pathway to citizenship.

On Saturday, September 19, 2026, M.L.S. will be released from the South Carolina Department of Juvenile Justice ("SC DJJ") for good behavior after completing a sentence for a juvenile delinquency adjudication. Rather than being returned to SC DSS custody, however, M.L.S. will be detained by U.S. Immigration and Customs Enforcement ("ICE") pursuant to a detainer claiming that he is subject to mandatory detention under the Laken Riley Act ("LRA"). His re-detention by ICE is unlawful for at least two reasons. First, the LRA does not apply to juvenile delinquency adjudications and thus does not mandate M.L.S.'s detention. M.L.S.'s prior release by ORR and the strong liberty interest created by his SIJS, he should be provided meaningful pre-deprivation process before being re-detained to make sure his detention is justified. Instead, upon information and belief, M.L.S. has been and will be provided no process whatsoever, violating his procedural due process rights. Second, federal law requires that unaccompanied children must be placed in the "least restrictive setting" consistent with their best interests. 8 U.S.C. § 1232(c)(2)(A). Yet, upon information and belief, there has been no finding that M.L.S. being taken into physical custody by ICE and detained away from his legal custodian, SC DSS, satisfies this requirement. Furthermore, ICE has refused to provide M.L.S. 's counsel with any information on whether they will treat him as an unaccompanied child, whether he will be detained separately from adults, or where he will be transferred.

In light of M.L.S.'s imminent unlawful re-detention, he respectfully requests that this Court issue a temporary restraining order (1) enjoin Respondents from transferring him outside of this District for the duration of this proceeding; (2) enter an Order to Show Cause requiring Respondents to file a return within three days and setting a hearing within five days, per 28

U.S.C. § 2243; and (3) issue a writ of habeas corpus ordering Respondents to immediately release M.L.S. to the custody of SC DSS and enjoining his re-detention absent adequate pre-deprivation process. Petitioner also requests that this Court maintain jurisdiction regardless of where ICE transfers M.L.S.

## LEGAL BACKGROUND

It is well established that ICE's detention authority is not unlimited. *Zadvyas v. Davis*, 533 U.S. 678 (2001). ICE's detention authority over unaccompanied immigrant children, including their care and custody, is limited by a distinct legal framework requiring, among other things, that these children be placed in "the least restrictive setting" in their best interests (which typically means placement with a sponsor outside of detention) and cannot be held with unrelated adults for more than 24 hours. Many unaccompanied children, like M.L.S., are also eligible for SIJS, which Congress created to provide a pathway to citizenship for vulnerable immigrant children who have suffered from parental maltreatment and whose best interests it is to remain in the United States.

In 2025, Congress passed the Laken Riley Act (LRA), which expanded mandatory immigration detention to include individuals who are arrested for, charged with, convicted of, or admit to committing specified crimes. 8 U.S.C. § 1226(c)(1)(E). The LRA does not apply to juvenile delinquency charges, proceedings, or adjudications.

### I. Legal Framework for Care and Custody of Unaccompanied Children

In 2002, Congress passed the Homeland Security Act ("HSA"), transferring functions of the former INS to other government entities. Pub. L. No. 107-296, 116 Stat. 2153 (2002). Specifically, the HSA transferred authority over the care and custody of unaccompanied immigrant children from the INS to ORR, which is housed within the Department of Health and

Human Services ("HHS"). 6 U.S.C. § 279. The HSA defines an unaccompanied child as a child who:

> "(A) has no lawful immigration status in the United States;
> (B) has not attained 18 years of age; and
> (C) with respect to whom —
> i. there is no parent or legal guardian in the United States; or
> ii. no parent or legal guardian in the United States is available to provide care and physical custody."
>
> 6 U.S.C. § 279(g)(2).

Congress' decision to transfer responsibility for the care and custody of unaccompanied children from the INS to ORR reflected a determination that caring for children who arrive to the United States without their parent or legal guardian and immigration enforcement were incompatible roles for a single agency. Within HHS, ORR is responsible for children's safety and welfare and is explicitly "not a law enforcement agency." Foundational Rule, 89 Fed. Reg. at 34399, 34423, 34591.

Congress then expanded protections for unaccompanied children in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), reaffirming its intent to treat unaccompanied children differently than immigrant adults, both in detention and in immigration proceedings. 8 U.S.C. § 1232 et seq. The TVPRA requires the HHS, through ORR, to manage the care and custody of all unaccompanied children. 8 U.S.C. § 1232(c)(2). The statute requires ORR to place unaccompanied children "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A); see also 45 C.F.R. § 410.1003(f). The least restrictive setting is typically release from ORR custody. See 8 U.S.C. § 1232(c)(2)(A); 45 C.F.R. § 410.1209(e); *Saravia v. Sessions*, 905 F.3d 1137, 1143 (9th Cir. 2018).

Before releasing an unaccompanied child from its custody, the agency must "consider danger to self, danger to the community, and risk of flight." *Id.*; see also 6 U.S.C. § 279(b)(2)(A). ORR may release the unaccompanied child to a "sponsor" who already lives in the United States, so long as these and other criteria are satisfied. 6 U.S.C. § 279(b)(2)(A); see also 45 C.F.R. § 410.1201. Under its regulations, ORR must release an unaccompanied child in a specified order of preference, with a parent having first preference and "legal guardian" having second preference. See 45 C.F.R. § 410.1201(a)(1)-(6).

The Flores Settlement Agreement ("FSA") establishes national minimum standards for the treatment and placement of minors in immigration custody. The FSA arose from a lawsuit filed by a group of immigrant children challenging their detention and seeking to be released to family members and/or sponsors within the United States. See *Flores v. Sessions*, 862 F.3d 863, 869 (9th Cir. 2017) (discussing the history of the Flores litigation). All children detained by ICE are class members protected by the FSA. In 1997, a consent decree was reached with the federal government that created a nationwide policy governing the custody and release of immigrant children by immigration authorities. See Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 84-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997); see also *Flores v. Sessions*, Case No. CV 85-4544-DMG (C.D. Cal., July 9, 2018) (affirming the terms of the FSA).

"The Flores Settlement Agreement [FSA] remains in full force and effect as to the DHS, including the U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement." *Flores v. Garland*, 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024)[1]. Among other things, the FSA requires that minors: (a) cannot be held with unrelated adults for more than

---

[1] The FSA remains under the supervision of U.S. District Judge Dolly M. Gee in the Central District of California. *Flores v. Bondi*, No. CV 85-4544-DMG (AGRx).

24 hours, (b) must be placed in the "least restrictive setting" appropriate to the minor's needs, (c) can only be held in "secure" facilities if strict criteria are met. Section 462 of the HSA extended the key terms of the FSA to all unaccompanied immigrant children, including the requirement that ORR place such children in the least restrictive setting. See Pub. L. 107-296, 116 Stat. 2153 (Nov. 25, 2002).

**II. Special Immigrant Juvenile Status (SIJS)**

In 1990, Congress created SIJS to protect certain vulnerable immigrant children and provide them a pathway to citizenship. Immigration Act of 1990, Pub. L. No. 101-649, § 153, 104 Stat. 4978 (1990) (amending various sections of the INA). SIJS benefits are humanitarian protections designed exclusively for abused, neglected, or abandoned children and youth. SIJS "alleviates hardships experienced by some dependents of United States juvenile courts by providing qualified [noncitizens] with the opportunity to apply for special immigrant classification and lawful permanent resident status, with [the] possibility of becoming citizens of the United States in the future." Special Immigrant Status, 58 Fed. Reg. 42843, 43844 (Aug. 12, 1993). Since 1990, Congress has amended the INA multiple times to expand the protections of SIJS, most recently in 2008, through the TVPRA, Pub. L. 110-457, § 235(d), 122 Stat. 5044 (2008).

To be granted SIJS, youths must first "satisf[y] a set of rigorous, congressionally defined eligibility criteria." *Osorio-Martinez v. U.S. Att'y Gen.*, 893 F.3d 153, 163 (3d Cir. 2018). Specifically, to be eligible for SIJS, a noncitizen youth must be present in the United States and obtain judicial determinations in a state juvenile court order that they are dependent on the juvenile court or placed by the court under the custody of a state agency or an individual; cannot be reunified with one or both parents because of abuse, neglect, abandonment, or other similar

basis; and that it is not in their best interest to return to their country of origin. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c). *See also Fuentes v. United States Citizenship & Immigr. Servs.*, 184 F.4th 311, 314–15 (4th Cir. 2026) (explaining eligibility requirements for SIJS).

SIJS is a two-step process wherein the juvenile court issues qualifying orders with factual findings on dependency and best interests, followed by USCIS adjudication of the SIJS petition. The application process for SIJS includes submitting a petition to U.S. Citizenship and Immigration Services ("USCIS"), along with the state juvenile court order and other evidence. See 8 C.F.R. § 204.11(b). If USCIS exercises its statutory "consent function" to approve the petition, the agency recognizes the state juvenile court's determinations, including that the child's return to their country of origin would be contrary to their best interests. 8 U.S.C. § 1101(a)(27)(J)(iii).

The main benefit of SIJS—and indeed, its core purpose—is that it confers on vulnerable young people the right to seek lawful permanent resident ("LPR") status (or a "green card"), while remaining in the United States, through a process called adjustment of status. *See* 8 U.S.C. § 1255(h); *Garcia v. Holder*, 659 F.3d 1261, 1271 (9th Cir. 2011) (abrogated on other grounds) (SIJS "show[s] a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for LPR status").

Although SIJS renders youth eligible to apply for adjustment to LPR status, they can only do so when a visa is immediately available to them. 8 U.S.C. § 1255(h). However, there is an annual limit on visas available to SIJS beneficiaries. 8 U.S.C. § 1153(b)(4). And since 2016, the number of SIJS beneficiaries has surpassed the supply of available visas for most countries, leaving what has been estimated to be more than 100,000 young people in a SIJS backlog, waiting to apply for a green card. According to the USCIS September Visa Bulletin, there are

currently only sufficient visas available for people who filed for SIJS on or before December 15, 2022, to immediately apply for LPR status.

### III. The Laken Riley Act

The Laken Riley Act (LRA) was enacted on January 29, 2025, and amends INA § 236(c)(1) (8 U.S.C.A. § 1226(c)(1)) by adding a new subparagraph (E). Under the LRA, individuals who are charged as "inadmissible" under INA § 212(6)(A), (6)(C), or (7) (8 U.S.C.A. § 1182(6)(A), (6)(C), or (7)) **and** are "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person" are subject to mandatory detention. 8 U.S.C. § 1226(c)(1)(E)(i), (ii). Although the LRA does not explicitly exempt children from its mandatory detention provisions, courts have not considered acts of juvenile delinquency (including admissions to acts of delinquency) qualifying offenses under the LRA. *See, e.g.*, *C.R.J.M. v. Kennedy*, No. 2:26-cv-00742-DJC-EFB, 2026 WL 809940, at *3 (E.D. Cal. Mar. 24, 2026).

## FACTS

A full recitation of the facts of M.L.S.'s case is set out in his habeas petition, and relevant facts are reprised here. Petitioner M.L.S. was born in Honduras and fled to the United States at age 13 as an unaccompanied child. He was initially held in ORR custody but was released to a sponsor, his aunt, in South Carolina. After his aunt abandoned him, he was placed in the legal custody of SC DSS. Based on the findings of the South Carolina Family Court, M.L.S. was granted SIJS in July 2026. M.L.S. is currently being held by the South Carolina Department of Juvenile Justice (SC DJJ) and is to be released on good behavior on September 19, 2026.

However, SC DJJ has indicated that they intend to release him not to SC DSS, but to ICE, in light of detainer invoking the LRA, despite the fact that detainer does not apply to M.L.S. 's juvenile adjudications. As of the date of this filing, ICE has refused to provide any confirmation to M.L.S.'s counsel that it will treat M.L.S. as an unaccompanied child, or that it will comply with the TVPRA and the terms of the Flores Agreement.

## ARGUMENT

### I. Legal Standard.

The substantive standard for granting either a temporary restraining order or a preliminary injunction is the same. *U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006). Temporary restraining orders are governed by Rule 65 of the Federal Rules of Civil Procedure, which provides that a temporary restraining order shall not issue in the absence of "specific facts [which] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party may be heard in opposition." Fed. R. Civ. P. 65(b)(1). The United States Supreme Court has held that a party seeking a preliminary injunction or temporary restraining order must establish all four of the following elements: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reissued in part, 607 F.3d 355 (4th Cir. 2010).

A temporary restraining order or preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). The Administrative Procedure Act expressly permits courts to enjoin agency actions that would cause

irreparable harm. 5 U.S.C. § 705. Courts apply the traditional factors for an injunction to evaluate stays under § 705. *Hsiao v. Stewart*, 527 F. Supp. 3d 1237, 1248 (D. Haw. 2021). The first two factors are the most important. *Nken v. Holder*, 556 U.S. 418, 434 (2009). But the third and fourth factors typically "merge when the Government is the opposing party." *Id.* at 435.

## II. M.L.S. Is Likely to Succeed on the Merits of His Petition Because His Detention is Unlawful.

M.L.S. is likely to succeed on the merits of his habeas petition because he is "in custody in violation of the Constitution or laws or treaties of the United States," as ICE's decision to re-detain M.L.S. without any pre-deprivation process and without any consideration for the requirements of the TVPRA and Flores Settlement Agreement violates the Due Process Clause of the Fifth Amendment and federal statute and regulation.

### A. The Laken Riley Act Does Not Apply to Juvenile Delinquency

ICE's issuance of an immigration detainer based on M.L.S.'s juvenile history is unlawful because M.L.S. because acts of juvenile delinquency (including admissions to acts of delinquency) are not qualifying offenses under the LRA, 8 U.S.C. 1226(c)(1)(E). *See, e.g.*, *C.R.J.M. v. Kennedy*, No. 2:26-cv-00742-DJC-EFB, 2026 WL 809940, at *3 (E.D. Cal. Mar. 24, 2026) (holding that delinquency proceedings do not trigger LRA and ordering minor's immediate release). This is consistent with the fact that under settled interpretation of the Immigration and Nationality Act (INA), an act of juvenile delinquency is not a crime. *See Matter of Devison*, 22 I&N Dec. 1362, 1365 (BIA 2000) (reaffirming longstanding rule "that juvenile delinquency proceedings are not criminal proceedings, that acts of juvenile delinquency are not crimes, and that findings of juvenile delinquency are not convictions for immigration purposes"); *see also* 7 USCIS-PM F.7(C)(4) ("Findings of juvenile delinquency are not considered criminal convictions for purposes of immigration law.").

Indeed, as Congress itself has recognized, adjudications for juvenile delinquency are separate from criminal convictions. See *Devinson*, 22 I&N Dec. at 1366 (noting that the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031-5032, "makes it clear that a juvenile delinquency proceeding results in the adjudication of a status rather than conviction for a crime"). Moreover, the LRA's terms "charged with" and "arrested for" modify the terms "offense" and "crime." 8 U.S.C. § 1226(c)(1)(E). These two terms also appear in the INA's current grounds of inadmissibility and have long been interpreted to refer only to adult crimes. See, e.g., 8 U.S.C. § 1182(a)(2)(A) (referring to convictions and admissions of certain crimes), 8 U.S.C. § 1182 (a)(2)(B) (referring to people convicted of two or more offenses). Similarly, the LRA's language regarding what constitutes an admission of a crime, 8 U.S.C. § 1226(c)(1)(E), is identical to the same language in the INA inadmissibility ground only applied to adult crimes, 8 U.S.C. § 1182(a)(2)(A)(i) (covering a person "who admits having committed, or who admits committing acts which constitute the essential elements of" certain crimes)[2].

In the absence of any explicit indication in the text of the LRA, 8 U.S.C. § 1226(c)(1)(E) should be interpreted to be only about crimes, not acts of delinquency addressed in a civil system. Thus, an arrest or charge for one of the enumerated offenses that is or would be handled in a juvenile delinquency system must not trigger the mandatory detention provision under 8 U.S.C. 1226(c) and ICE's use of the LRA to mandatorily detain M.L.S. is unlawful.

---

[2] If Congress meant to upend decades of immigration law precedent with the LRA, it would have been explicit. Indeed, the only two times that the INA has imposed a mandatory bar based on juvenile delinquency, this was specifically stated in the statute or regulation. See the Adam Walsh Act provisions at 8 U.S.C. § 1152(a)(1)(A)(viii), which includes certain delinquency dispositions as defined at 34 U.S.C. § 20911(8) and the Family Unity inclusion of delinquency dispositions at 8 C.F.R. § 236.13(d).

**B. The Detention of M.L.S. Violates his Procedural Due Process Rights**

The government may not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. V. Due process protects "all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 698 (2001). A child's interest in being free from confinement is no narrower than that of an adult. *In re Gault*, 387 U.S. 1, 13 (1967); *Reno v. Flores*, 507 U.S. 292, 316 (1993) (O'Connor, J. and Souter J., concurring) ("[The Supreme Court] ha[s] consistently […] rejected the assertion that 'a child, unlike an adult, has a right 'not to liberty but to custody.'").

The procedural due process guarantee of the Fifth Amendment requires that individuals be provided adequate process before being deprived of liberty or property interests. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). To assess what process is due, courts must assess (1) "the private interest that will be affected by the official action[,]" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards[,]" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.*

M.L.S. has a substantial private interest in his liberty. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Moreover, previously releasing an individual from detention, as M.L.S. was by ORR, creates an independent liberty interest in "remaining out of custody" absent some significant change. *See F.S.S.M. v. Wofford*, No. 25-

01518, 2025 WL 3526671, at *3 (E.D. Cal. Dec. 9, 2025) (citing *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).

Furthermore, to be approved for SIJS, M.L.S. had to meet stringent eligibility criteria and he was promised that, in return, he would be given a meaningful path to LPR status in this country. That came with the expectation that he could build a life here without risking arbitrary arrest, detention, and removal that would strip him of the very permanency Congress created SIJS to provide vulnerable youth like him—further strengthening his interest in his liberty. *See Rodriguez v. Perry*, 747 F. Supp. 3d 911 (E.D. Va. 2024); *Sarmiento v. Perry*, No. 25-CV-01644, 2025 WL 3091140, at *3 (E.D. Va. Nov. 5, 2025); *Campos-Flores v. Bondi*, No. 25-cv-797, 2025 WL 3461551, at *6 (E.D. Va. Dec. 2, 2025).

The second *Mathews* factor also weighs in M.L.S.'s favor. M.L.S. was previously released from detention after being found that he is neither a danger nor a flight risk, and his re-detention without any process whatsoever makes the risk of erroneous deprivation of liberty high. Respondents' invocation of the LRA to claim that M.L.S. is subject to mandatory detention under 8 U.S.C. § 1226(c)(1)(E) is misplaced. Respondents' interpretation of the LRA contravenes decades of clear case law holding that under the INA, an act of juvenile delinquency is not a crime. *See C.R.J.M.* 2026 WL 809940, at *3 (holding that delinquency proceedings in state court do not trigger mandatory detention under LRA and finding high risk of erroneous deprivation of liberty). Accordingly, no statute mandates M.L.S.'s detention and the value of additional procedural safeguards to determine whether detention is appropriate is high.

The third *Mathews* factor favors M.L.S., as well. M.L.S.'s detention imposes high fiscal and administrative burdens on Respondents. Releasing M.L.S. and requiring the government to provide a pre-deprivation hearing before re-detaining him, to ensure any detention is actually

justified, stands to save the government money and effort wasted on erroneous detention. *See Velasco Lopez v. Decker*, 978 F.3d 842, 854 (2d Cir. 2020). And unlawful detention and violation of noncitizens' constitutional rights disserve the public interest.

Respondents thus violated procedural due process by re-detaining M.L.S. without adequate procedural protections before depriving him of his liberty. Where an unaccompanied child was previously apprehended and released, like M.L.S., due process requires a "pre-deprivation bond hearing where the government bears the burden of proving by clear and convincing evidence that petitioner is a flight risk or danger to the community." *Singh v. Andrews*, No. 1:25-cv-00801-KES-SKO (HC), 2025 WL 1918679, at *8 (E.D. Cal. July 11, 2025); *see also Garcia Domingo v. Castro*, 806 F. Supp. 3d 1246, 1252-53 (D.N.M. 2025) (similar); *Urquilla-Ramos v. Trump*, No. 2:26-CV-00066, 2026 WL 475069 (S.D.W. Va. Feb. 19, 2026) (finding due process violation where individual previously released as an unaccompanied child "was re-arrested and detained [with] neither notice nor an opportunity to be heard as to whether a change in custody status was warranted").

**C. The TVPRA and Implementing Regulations Mandate Prompt Placement in the Least Restrictive Setting and Give Rise to a Protected Liberty Interest.**

The TVPRA was enacted to ensure "safe and secure" placement for children arriving unaccompanied in the United States, and, crucially, mandates that an unaccompanied child "shall be promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(1), (c)(2)(A) (emphasis added). The TVPRA's "focus on care and placement – rather than on detention – is evident." *Flores v. Sessions*, 862 F.3d 863, 876 (9th Cir. 2017). M.L.S.'s imminent detention by ICE– as well as Respondents' intention to seek their transfer outside of this judicial District while these proceedings are ongoing, without providing any information as to why such a transfer is necessary or in their best interest – is clearly at odds with their statutory

and regulatory obligations under the TVPRA, and M.L.S. is therefore entitled to injunctive relief ordering his immediate release to SC DSS.

M.L.S. is an unaccompanied child as defined under the Homeland Security Act. 6 U.S.C. § 279(g)(2): he has no lawful immigration status, is under 18, and has no parent or legal guardian in the United States nor is one available to provide care and physical custody. Respondents have a non-discretionary duty to promptly place M.L.S. in the least restrictive setting that is in his best interests. 8 U.S.C. § 1232(c)(2)(A). To the extent Respondents release M.L.S. to ORR custody, ORR is required to release M.L.S., without "unnecessary delay" to his legal guardian, i.e. SC DSS. 45 C.F.R. § 410.1201(a)(2).

Upon information and belief, Respondents have failed to assess whether holding M.L.S. in physical immigration custody is the least restrictive setting in his best interests, particularly given his legal custody by SC DSS, in violation of 8 U.S.C. § 1232(c)(2)(A). Upon information and belief, Respondents will continue to hold M.L.S. in a secure ICE or ORR facility despite there being less restrictive alternatives, such as release to SC DSS. Upon information and belief, if Respondents do not release M.L.S. to SC DSS, it will not be able to hold M.L.S. separately from unrelated adults while he remains in the state of South Carolina, in violation of the Flores Settlement Agreement.

**III. M.L.S.'s Detention is Causing Him Irreparable Harm.**

M.L.S.'s unlawful detention is causing him irreparable harm. First, there is no mechanism to repair the unlawful deprivation of liberty that M.L.S. will imminently suffer. M.L.S. is a minor and on Saturday, September 19, 2026, will be detained by ICE. M.L.S.'s removal from the State of South Carolina is imminent. There are no juvenile ICE facilities in the state of South Carolina. There are no ICE facilities in the state of South Carolina. Individuals

held by ICE in South Carolina are held in state-run correctional facilities while ICE arranges for their transfer out of state, typically to ICE detention facilities in Georgia. If M.L.S. is removed outside of South Carolina, he will lose access to his only legal guardian at this time, SC DSS, which will cause him irreparable harm.

Second, the likely unconstitutional deprivation of M.L.S.'s liberty alone constitutes irreparable harm. *See Leaders of a Beautiful Struggle v. Baltimore Police Department,* 2 F.4th 330, 346 (4th Cir. 2021) (en banc) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied."); *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (a constitutional deprivation of liberty "for even minimal periods of time, unquestionably constitutes irreparable injury").

## IV. Equities Favor Restraining M.L.S.'s Detention.

When the government is the opposing party, the final two factors—the balance of the equities and public interest—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, M.L.S.'s interest in his continued liberty and the ongoing harm he is experiencing far outweigh the nonexistent government interests in his detention, which is also costing valuable taxpayer dollars. M.L.S. is a vulnerable unaccompanied child with no parent or adult to take legal custody of him, who has a pathway to lawful permanent residence, and who is likely to prove that Respondents have violated both his statutory and constitutional rights in applying the Laken Riley Act's mandatory detention to him and failing to provide him any pre-deprivation process before re-detaining him or considering him for placement in the least restrictive setting that is in his M.L.S.'s best interest. By contrast, ICE will suffer no harm from foregoing detention for M.L.S. and releasing him to SC DSS. Foregoing detention would in fact save the government

substantial resources, including the complexities of detaining an unaccompanied child whose legal guardian is a state social services agency.

Moreover, stopping the unlawful, arbitrary detention of minors with a legal pathway to legal permanent residence is in the public interest. There is also "no public interest in the perpetuation of unlawful agency action," *R.J. Reynolds Vapor Co. v. Food & Drug Admin*., 65 F.4th 182, 195 (5th Cir. 2023), but a "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations,'" *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

## CONCLUSION

For these reasons, this Court should restrain ICE from transferring M.L.S. from this Court's jurisdiction and order his immediate release to S.C. DSS custody.

Date: September 18, 2026,

Respectfully submitted,

s/Brad Banias
BRAD BANIAS
Banias Law, LLC
602 Rutledge Avenue
Charleston, SC 29403
843.352.4272
brad@baniaslaw.com

s/Diana Marin
National Immigration Project
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009*
734-307-0862
diana@nipnlg.org
(Pro Hac Vice Admission Forthcoming)

*Attorneys for Plaintiff*